
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  40013-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JESUS SALAZAR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

COONEY, J. — Jesus Salazar was convicted of residential burglary and malicious mischief in the third degree after a jury trial.  Mr. Salazar appeals, arguing that the jury was improperly instructed on a permissive inference of criminal intent, the court erred in excluding evidence of a witness' prior inconsistent statement, and he was afforded ineffective assistance from his trial counsel.  We disagree with each contention and affirm.

BACKGROUND

M.O.[1] and Mr. Salazar had a friendship that evolved into a dating relationship. On discovering the relationship, M.O.'s mother, Rhonda Houghland, instructed Mr. Salazar to cease any contact with M.O. Despite Ms. Houghland's disapproval, M.O. and Mr. Salazar made plans to "hang out for like maybe thirty minutes, tops" before school. Rep. of Proc. (RP) at 337.[2] M.O. cancelled the plans after realizing "it was already too late," and she was going to miss school. RP at 338. M.O. later invited G.G.S., a male classmate, to her home after school. At the end of the school day, M.O. exited her residence to greet G.G.S. and noticed Mr. Salazar in his car nearby. Mr. Salazar yelled "what the fuck are you guys doing" as G.G.S. and M.O. hurried into M.O.'s home. RP at 352. M.O. locked the door behind her.

G.G.S. and M.O. went downstairs and into M.O.'s bedroom. Mr. Salazar began pounding on M.O.'s bedroom window. He partially opened the window and questioned whether M.O. was having sexual relations with both he and G.G.S. M.O. instructed G.G.S. to go upstairs. M.O. told Mr. Salazar to leave and went back upstairs. Shortly

---

[1] To protect the privacy interests of M.O. and G.G.S., we use initials throughout this opinion. Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses,* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III

[2] We refer to the report of proceedings covering the duration of trial unless otherwise stated.

thereafter, G.G.S. heard the sound of a window breaking. M.O. then noticed Mr. Salazar at the bottom of the stairs with blood running down his hand. In an aggressive tone, Mr. Salazar questioned, "where is that pussy," referring to G.G.S., and stated "that he was going to beat [G.G.S.'s] ass." RP at 266, 363.

G.G.S. called 911, and Mr. Salazar was eventually arrested inside M.O.'s house. He was later charged with residential burglary and malicious mischief in the third degree. The case proceeded to a jury trial.

At trial, G.G.S. testified that Mr. Salazar threatened him but never touched him. G.G.S. feared Mr. Salazar would have assaulted him had law enforcement not arrived. During the direct examination of G.G.S., the prosecutor asked, "[O]verall, at the time of the incident, were you scared?" RP at 279. G.G.S. responded, "Just when [Mr. Salazar]—after [Mr. Salazar] had broken in." RP at 279. On cross-examination, defense counsel questioned G.G.S. about whether the officers asked him if he felt scared:

> [DEFENSE COUNSEL]: Okay. And when the police asked you whether or not you felt scared or threatened, what did you say?
>
> [THE STATE]: Objection. Relevance.
>
> [G.G.S.]: When they asked what?
>
> . . . .
>
> [DEFENSE COUNSEL]: [The State] asked multiple times whether or not he felt scared.
>
> [COURT]: I'll allow it. Go ahead.

3

[DEFENSE COUNSEL]: So, did you—what—what did you tell police when they asked you whether or not you felt scared?

[G.G.S.]: The police didn't ask me if I felt scared.

[DEFENSE COUNSEL]: Okay. Are you—do you remember specifically that they didn't ask you that?

[G.G.S.]: Yeah.

[DEFENSE COUNSEL]: Okay. So, you've never told police—you—your testimony is that you never told police that—or your testimony is that the police never asked you whether or not you felt scared?

[G.G.S.]: No.

[DEFENSE COUNSEL]: Okay. Did—did you tell them whether or not you felt scared, unprompted?

[G.G.S.]: [No audible response].

[DEFENSE COUNSEL]: Okay.

RP at 281-82. Neither party objected to G.G.S. being excused at the conclusion of his testimony.

Later, a discussion ensued over which of the two officers the State would be calling:

[DEFENSE COUNSEL]: And I guess—this might also be something useful to discuss since the State's sort of unsure what—what officer they're going to call. So, I—I have the police reports that— from Deputy Marshall that has some statements in it that contradict what [G.G.S] testified to. So, I'm going to need to ask some impeachment questions for prior inconsistent statements.

So, if—if the State is—I guess I would just request that if the State's only going to call one officer, that that be—be [Sergeant] Marshall.

4

RP at 371-72. The State objected to the defense "dictating which witnesses" it had to call and to the defense calling Sergeant James Marshall as an impeachment witness. RP at 372. Defense counsel responded that G.G.S. had an opportunity to deny telling the officers he did not feel afraid, therefore Sergeant Marshall was being called to impeach G.G.S.'s testimony. The court then inquired:

> [COURT]: I'm wondering, [defense counsel], why didn't you just ask [G.G.S.] well, are you aware that the police report says—or are you aware that Sergeant Marshall has stated that you did tell him you were afraid?
>
> [DEFENSE]: You know, Judge, I mean, I guess if I had known that this was going to be an issue, I—I would have been more comprehensive. I felt when I asked him that he was giving a definitive statement and I—I guess it just didn't seem like it was necessary to probe into what exactly the officer had reported that he said to him.

RP at 380. The court excluded the testimony:

> I'm concerned about the oddity that—that— that the defense is seeking to impeach a witness who has now left the witness stand, wasn't asked anything about well, why did you—are you aware that the officer says that you told them something?
>
> I understand the argument hey, look, it was clear what is there to ask about; but I don't know, maybe that he would have had some kind of explanation. I think what—where I land on this is that we are talking about impeachment by contradiction - the analysis in—the Court will adhere to the analysis in TEGLAND's 6.07:10, and, in particular, the notion that the contradictory evidence must be admissible under the usual rules of evidence.
>
> And based on what I've heard so far, I don't see that the statement in question, the alleged statement to Sergeant Marshall, is admissible. It sounds like hearsay if it's offered as substantive evidence. And I know that the attempt is to impeach through contradiction, but I'm going to exclude it under that analysis.

RP at 388. Neither party called Sergeant Marshall to testify.

An instruction conference was held at the conclusion of the evidentiary portion of the trial. The State proposed Washington Pattern Jury Instruction (WPIC) 60.05, which would later become "Instruction 10." Clerk's Papers (CP) at 41. Instruction 10 reads:

> A person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein. This inference is not binding upon you and it is for you to determine what weight, if any, such inference is to be given.

CP at 41. Defense counsel objected to the inclusion of instruction 10, claiming it shifted the burden to Mr. Salazar. In electing to provide the jury with instruction 10, the court reasoned:

> The COMMENT does point out that inferences are generally not favored in criminal law. What I was hoping for was an analysis of the three important limitations identified in the COMMENT to WPIC 60.05.
>
> Number one talks about whether the inference would be the quote "sole proof" of the intent element in this case. We have, for example, testimony that the defendant was telling—was stating that he intended to beat [G.G.S.'s] ass or words to that effect, this is upon entry. I think there was also some testimony as to intent from even before he went through the window. So, one seems to be satisfied.
>
> Number two just talks about certain language that should not ever be given and I don't see that language in the proposed instruction in this case.
>
> Number three is this instruction should not be given in an attempted burglary case. This is not an attempted burglary case.
>
> I think all three items have been satisfied and the Court will give the State's instruction based on WPIC 60.05.

6

RP at 424-25. Defense counsel successfully advocated for the inclusion of an instruction on the lesser included offense to residential burglary of criminal trespass in the first degree.

The jury ultimately found Mr. Salazar guilty of residential burglary and malicious mischief in the third degree. The jury also returned a special verdict, finding that Mr. Salazar and M.O. were intimate partners. Mr. Salazar was sentenced to 90 days of confinement and 12 months of community custody.

Mr. Salazar timely appeals.

## ANALYSIS

INSTRUCTION 10—PERMISSIBLE INFERENCE OF CRIMINAL INTENT

Mr. Salazar argues instruction 10 violated his right to due process and was an unconstitutional judicial comment on the evidence. We disagree.

"The standard of review for a trial court's refusal to give a jury instruction depends on the basis of the trial court's decision: if the decision was based on a factual determination, it is reviewed for an abuse of discretion; if the decision was based on a legal conclusion, it is reviewed de novo." *State v. Tullar*, 9 Wn. App. 2d 151, 155, 442 P.3d 620 (2019).

Here, the trial court recognized that inferences are generally disfavored in criminal law. The court then applied the evidence to the limitations identified in the comments to

WPIC 60.05.  Because the trial court's decision to provide the jury with instruction 10 was based on a factual analysis, we review the court's decision for an abuse of discretion.

A court "abuses its discretion when its decision 'is manifestly unreasonable or exercised on untenable grounds.'"  *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 203-04, 75 P.3d 944 (2003) (quoting *State ex rel Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).  A court's "decision is based on 'untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard."  *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

Mr. Salazar argues that instruction 10 violated his right to due process because the inferred fact of intent does not meet the more likely than not standard, and intent cannot be inferred from equivocal evidence.  The State argues that the inference of intent more likely than not flowed from the evidence of unlawful entry.

Due process requires that the State meet its burden of proof beyond a reasonable doubt for every "essential element of a crime."  *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994) (quoting *Francis v. Franklin*, 471 U.S. 307, 313, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985)).  Presumptions and inferences can be used to aid in meeting the burden of proof, despite being disfavored in criminal law.  *State v. Cantu*, 156 Wn.2d 819, 826, 132 P.3d 725 (2006).  "'[W]hen permissive inferences are only part of the State's proof supporting an element and not the 'sole and sufficient' proof of such

8

element, due process is not offended if the prosecution shows that the inference more likely than not flows from the proven fact.'" *Id.* (quoting *State v. Deal*, 128 Wn.2d 693, 700, 911 P.2d 996 (1996)). Permissive presumptions do not relieve the State of its burden of proving every element of the charged crime. *Cantu*, 156 Wn.2d at 822.

RCW 9A.52.040 states:

> In any prosecution for burglary, any person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein, unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent.

Instruction 10's genesis is grounded in RCW 9A.52.040 and reads:

> A person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein. This inference is not binding upon you and it is for you to determine what weight, if any, such inference is to be given.

CP at 41.

Generally, three limitations restrict the use of instructions based on RCW 9A.52.040. First, where the permissive inference is not the only proof of the intent element, there is no due process violation provided the intent to commit a crime "more likely than not" flows from the proven fact. *State v. Brunson*, 128 Wn.2d 98, 107, 905 P.2d 346 (1995). Inferences of intent cannot be "patently equivocal," but rather must be a matter of "logical probability." *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985). "Intent may be inferred from all the facts and circumstances surrounding the

commission of an act or acts." *Id.* at 19. Second, the last clause of RCW 9A.52.040, "unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent," should be excluded from the instruction as it shifts the burden of proof to the defendant. *Id.* at 13 n.30. Third, the instruction should not be given in an attempted burglary case. *State v. Jackson*, 112 Wn.2d 867, 876, 774 P.2d 1211 (1989).

Here, in adhering to the holding in *Deal*, instruction 10 excluded RCW 9A.52.040's burden shifting language. 128 Wn.2d at 700. The prohibition announced in *Jackson* was also inapplicable as Mr. Salazar was not charged with an anticipatory offense. 112 Wn.2d at 876. Therefore, the only issue is whether the intent to commit the crime "more likely than not" flowed from the proven fact. *Brunson*, 128 Wn.2d at 107.

Mr. Salazar argues that the facts in this case are equivocal. Thus, his intent may not be inferred as the facts do not make it more likely than not that he intended to commit a crime inside the residence. The State responds that the inference of intent more likely than not flowed from the facts surrounding the unlawful entry. We agree with the State.

The trial court did not abuse its discretion in providing the jury with instruction 10 as Mr. Salazar's intent to commit a crime within the residence more likely than not flowed from the facts surrounding his unlawful entry. Evidence was admitted that (1) Mr. Salazar followed G.G.S. to M.O.'s home, (2) acted violently in unlawfully entering M.O.'s residence, (3) attempted to locate G.G.S. within the home, (4) accused

10

M.O. of engaging in sexual relations with both he and G.G.S., (5) questioned in an aggressive tone "where is that pussy," in reference to G.G.S., and (6) threatened to "beat [G.G.S.'s] ass." RP at 266, 363.

The State introduced sufficient evidence that Mr. Salazar's entry into M.O.'s home was, as a matter of "logical probability," for the purpose of committing a crime against G.G.S. and, thus, did not violate his right to due process. *Bergeron*, 105 Wn.2d at 20. The trial court did not abuse its discretion in providing instruction 10 to the jury.

Mr. Salazar next argues that instruction 10 amounts to an unconstitutional comment on the evidence because it emphasized one specific permissible inference rather than referring to a general instruction on inferences.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. In determining whether jury instructions are an unconstitutional comment on the evidence, the court reviews this issue de novo within the context of the jury instructions as a whole. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Remarks that may, in effect, suggest the jury is not required to consider an element of an offense, could constitute judicial comment. *Id.* "[I]nstructions should not be so factually detailed as to emphasize certain aspects of a party's case and thus point up or buttress his argument to the jury but rather should be limited to enunciating basic and essential elements of the legal rules necessary." *State v. Alexander*, 7 Wn. App. 329, 335, 499 P.2d 263 (1972).

Here, instruction 10 did not provide any factual details related to the case. Rather, it merely reflected the statutory permissive inference language of RCW 9A.52.040.

Mr. Salazar further claims instruction 10 was unnecessary because the general instruction on direct and circumstantial evidence sufficed. In support of his argument, Mr. Salazar directs us to *State v. Stone*, 24 Wn. App. 270, 600 P.2d 677 (1979). In *Stone*, Mr. Stone was charged with second degree manslaughter. There, the trial court properly denied the inclusion of four proposed jury instructions that set forth various defense theories. The court reasoned that other instructions fully instructed the jury on the law of criminal negligence and were sufficiently broad for Mr. Stone to argue his theories to the jury. *Id.* at 273-74. On appeal, this court held that a "specific instruction should not be given when a general instruction adequately explains the law, and the parties are able to argue their theories of the case within the general instruction." *Id.* at 273.

Though the instruction on direct and circumstantial evidence is general, here, the facts are distinguishable from *Stone*. In *Stone*, the rejected instructions contained various theories of Mr. Stone's defense. Contrawise, instruction 10 contained only the language of RCW 9A.52.040 that allows a jury to infer the intent element in any burglary case. Moreover, the Supreme Court has approved the use of the permissive inference instructions in burglary cases where a general instruction on direct and circumstantial evidence has also been included. *See Brunson*, 128 Wn.2d at 101-03. Instruction 10 was not an unconstitutional comment on the evidence nor was it unnecessary.

12

EXTRINSIC EVIDENCE OF PRIOR INCONSISTENT STATEMENTS

Mr. Salazar presents a two-fold argument as to why the court erred in excluding extrinsic evidence of G.G.S.'s prior inconsistent statement. Mr. Salazar claims he complied with ER 613(b)'s procedural requirements for admission of the evidence and the evidence was offered for impeachment, not as substantive evidence. We disagree.

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Brockob*, 159 Wn.2d 311, 348, 150 P.3d 59 (2006).

To impeach a witness through extrinsic evidence of a prior inconsistent statement, the witness is first to be afforded an opportunity to explain or deny the statement. ER 613(b). Here, G.G.S. testified he feared Mr. Salazar during the State's direct examination. On cross-examination, defense counsel sought to impeach G.G.S.'s credibility by thrice inquiring whether the police asked him if he was scared. G.G.S. denied the police ever asked him whether he was scared. Defense counsel then asked, "Did—did you tell them whether or not you felt scared, unprompted?" RP at 282. Following this question, the record states, "[G.G.S.]: [No audible response]." RP at 282.

Defense counsel failed to follow the procedure of ER 613(b) by neglecting to ask G.G.S. whether *he ever told the police* that he was scared rather than whether *the police asked him* if he was scared. This would have given G.G.S. the opportunity to explain or deny the statement. G.G.S.'s response may then have led to defense counsel calling Sergeant Marshall to rebut G.G.S.'s testimony. The trial court did not abuse its discretion

13

in excluding the extrinsic evidence of G.G.S.'s prior inconsistent statement as Mr.

Salazar failed to meet the procedural requirements of ER 613(b).

Notwithstanding the procedural deficiencies, evidence of G.G.S.'s prior

inconsistent statement was irrelevant. To convict Mr. Salazar of residential burglary, the

State was required to prove beyond a reasonable doubt that Mr. Salazar entered M.O.'s

residence with intent to commit a crime against a person therein, among other elements.

RCW 9A.52.025. Consequently, G.G.S.'s subjective fear, or lack thereof, was of no

consequence.

In support of the "intent to commit a crime" element, the State presented M.O.'s

testimony. M.O. testified that Mr. Salazar followed G.G.S. as he traversed from school

to M.O.'s home, that Mr. Salazar questioned, through M.O.'s bedroom window, whether

she was having sexual relations with both he and G.G.S., and Mr. Salazar asked, "where

is that pussy" after entering her home without permission. RP at 266. She further

testified that Mr. Salazar was "[p]retty much he was saying that—he was pretty much

saying that he was going to beat [G.G.S.]'s ass and stuff like that." RP at 363-64. Given

M.O.'s testimony, G.G.S.'s prior inconsistent statement about his subjective fear, or lack

thereof, would have done nothing to cast doubt on Mr. Salazar's intent to commit a crime

within the residence.

The trial court did not abuse its discretion in excluding extrinsic evidence of

G.G.S.'s prior inconsistent statement.

INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Salazar argues his trial attorney was ineffective for not following proper impeachment procedure and for failing to ensure G.G.S. remained available to be recalled as a witness. Because Mr. Salazar is unable to demonstrate prejudice, we disagree.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

To prevail on a claim of ineffective assistance of counsel, an appellant bears the burden of showing (1) that his attorney's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, (2) that there is a reasonable probability that but for his attorney's poor performance, the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record, there is a strong presumption that defense counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. "The reasonableness of

counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). "When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

Even if we find that counsel's performance was deficient, an appellant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An appellant demonstrates prejudice by showing that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

Mr. Salazar argues his trial attorney was ineffective in failing to lay the proper foundation for admitting extrinsic impeachment evidence of G.G.S., and for not ensuring G.G.S. was available to be recalled as a witness.

As discussed above, defense counsel failed to comply with ER 613(b) by neglecting to ask G.G.S. specifically whether he told the police that he was scared. Consequently, defense counsel was deficient in failing to lay the proper foundation for introducing extrinsic evidence of G.G.S.'s prior inconsistent statement. Notwithstanding this deficiency, Mr. Salazar is unable to demonstrate prejudice.

16

No. 40013-1-III
*State v. Salazar*

As analyzed above, G.G.S.'s subjective fear was of no consequence to Mr. Salazar's intent in entering M.O.'s residence. Had the court allowed Mr. Salazar to introduce extrinsic evidence of G.G.S.'s prior inconsistent statement, the jury was still presented with M.O.'s testimony detailed above.

There exists no reasonable probability that but for Mr. Salazar's attorney's failure to comply with ER 613(b) the outcome of the proceedings would have been different. Because G.G.S.'s subjective fear was of no consequence to Mr. Salazar's intent, defense counsel was not ineffective in failing to have G.G.S. remain in attendance. Mr. Salazar's ineffective assistance of counsel claim fails.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Staab, A.C.J.                                Fearing, J.

17